JAMES H. TURKEN (SBN 89618)
turkenj@dicksteinshapiro.com
AMY L RUBINFELD (SBN 145194)
rubinfelda@dicksteinshapiro.com
JOHN L. TUELL (SBN 208808)
tuellj@dicksteinshapiro.com
FAWN A. WRIGHT (SBN 246443)
wrightf@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Telephone: (310) 772-8300
Facsimile: (310) 772-8301

Attorneys for Defendant and Counterclaimant NERVOUS TATTOO, INC. and Defendants CHRISTIAN AUDIGIER, INC.; BACKSTAGE WEB, INC. and SHOP ON STAGE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARDY LIFE, LLC, a California limited liability company,<br><br>            Plaintiff,<br><br>vs.<br><br>NERVOUS TATTOO, INC., a California corporation; CHRISTIAN AUDIGIER, INC., a California corporation; CHRISTIAN AUDIGIER, a California resident; BACKSTAGE WEB, INC., a California corporation; SHOP ON STAGE, INC., a California corporation, and DOES 1-10, inclusive,<br><br>            Defendants. | **CASE NO. CV08 03524 PA (CTx)**<br>**Assigned to the Hon. Percy Anderson**<br><br>**NERVOUS TATTOO, INC.'S OPPOSITION TO HARDY LIFE, LLC AND DONALD EDWARD HARDY'S SPECIAL MOTION TO STRIKE NERVOUS TATTOO, INC.'S SIXTH, SEVENTH, EIGHTH AND NINTH COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declarations of John L. Tuell and Henry R. Mandell and appendix of non-federal authority filed concurrently herewith]<br>**Date:  November 10, 2008**<br>**Time:  1:30 p.m.**<br>**Ctrm:  15** |

DOCSLA-35118v04

| | |
|---|---|
| 1  NERVOUS TATTOO, INC., a California corporation, | **Complaint Filed: May 29, 2008** |
| 2 | **First Amended Complaint Filed:** |
| 3  Counterclaimant, | **August 4, 2008** |
| | **Counterclaims Filed:  August 21,** |
| 4  vs. | **2008** |
| 5  HARDY LIFE, LLC, a California limited liability company; | **First Amended Counterclaims** |
| 6  STEPHEN HOEL, an individual; and DONALD EDWARD | **Filed October 24, 2008** |
| 7  HARDY, an individual, | **Trial Date:  June 9, 2009** |
| 8  Counterdefendants. | |

2

# **TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION ................................................................................1

II.   PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE PLAINTIFF DID NOT SATISFY THE REQUIREMENTS OF LOCAL RULE 7-3 AND THIS COURT'S STANDING ORDER ................3

III.  PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE NERVOUS TATTOO HAS AMENDED THE COUNTERCLAIMS AT ISSUE TO OMIT ANY REFERENCE TO ANY ALLEGEDLY PROTECTED ACTIVITY ..........................................................................7

IV.   NERVOUS TATTOO'S COUNTERCLAIMS DO NOT VIOLATE THE CALIFORNIA ANTI-SLAPP STATUTE ....................................8

    A.    Judicial Application Of The Anti-SLAPP Statute ...................8

        1.    The "Prima Facie Case" Standard ................................8

        2.    The Timing Of The Claims Is Not Determinative....................10

        3.    A Claim Will Survive If It Is Supported By Any Theory Of Relief...........................................................................10

    B.    The Counterclaims At Issue Did Not Arise From Any Protective Activity.......................................................................11

        1.    Plaintiff's Wrongful Termination Of The License Agreement Is Neither Privileged Nor Protected.....................12

    C.    Nervous Tattoo Is Likely To Succeed On Its Counterclaims ..............17

        1.    Nervous Tattoo Is Likely To Prevail On Its Counterclaim For Intentional Interference With Actual And Prospective Economic Advantage.................................................................17

V.    CONCLUSION................................................................................20

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Brill Media Co., LLC v. TCW Group, Inc.*,
132 Cal.App.4th 324 (2005) ...................................................................... 14

*Church of Scientology v. Wollersheim*,
42 Cal.App.4th 628 (1996) ........................................................................ 9

*City of Cotati v. Cashman*,
29 Cal.4th 69 (2002) ................................................................................ 10

*ComputerXpress, Inc. v. Jackson*,
93 Cal.App.4th 993 (2001) ...................................................................... 10

*Kyle v. Carmon*,
71 Cal.App.4th 901 (1999) ........................................................................ 9

*Mann v. Quality Old Time Service, Inc.*,
120 Cal.App.4th 90 (2004) ...................................................................... 11

*Navellier v. Sletten*,
29 Cal.4th 82 (2004) .................................................................................. 9

*Pepsico, Inc. v. Cal. Security Cans*,
238 F.Supp.2nd 1172, 1176 (C.D. Cal. 2002) ........................................ 19

*Wilbanks v. Wolk*,
121 Cal.App.4th 883 (2004) ............................................................. 10, 17

*Wilcox v. Superior Court*,
27 Cal.App.4th 809 (1994) ........................................................................ 9

<u>Statutes</u>

California Business & Professions Code § 17200 ........................... 12, 19

Cailifornia Code of Civil Procedure § 425.16 ...................... 1, 14, 15

California Code of Civil Procedure § 425.17 ...................... 14, 15, 16

California Code of Civil Procedure § 425.17(a) ............................ 15

ii

TABLE OF AUTHORITIES

DOCSLA-35119v04

California Civil Code § 47(b) ................................................................. 1

<u>Other Authorities</u>

Fed. R. Civ. P. 15(a) ................................................................. 7, 8

Central District Local Rule 7-3 ................................................. 2, 3, 6, 7, 8

TABLE OF AUTHORITIES

DOCS LA:35119v04

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Hardy Life, LLC ("Plaintiff") initiated this action in May 2008 in an attempt to destroy defendant and counterclaimant Nervous Tattoo, Inc.'s ("Nervous Tattoo") business and reputation or, at the very least, force Nervous Tattoo to renegotiate the parties' existing license agreement (the "License Agreement") on terms more favorable to Plaintiff.   Notwithstanding Plaintiff's underlying motivation and end-game, Nervous Tattoo does not dispute that Plaintiff's Complaint and the barrage of ill-intentioned third party subpoenas that followed are protected by California's "litigation privilege."[1]   As a result, it is perplexing why Plaintiff's special motion to strike four of Nervous Tattoo's Counterclaims ("Anti-SLAPP Motion" or "Motion") pursuant to Cal. Code Civ. Proc. ("CCP") section 425.16 (the "Anti-SLAPP[2] Statute") appears to be based in large part on the erroneous argument that the Counterclaims at issue "arose" out of those activities.[3]

Nervous Tattoo's sixth, seventh, eighth and ninth Counterclaims[4] do not arise out of "protected activity" but, rather, are based upon Plaintiff's wrongful purported termination of the License Agreement and non-privileged derogatory statements to third parties about Nervous Tattoo's goods, all of which were designed to damage (or destroy) Nervous Tattoo's business and goodwill and none of which falls under the protection of the Anti-SLAPP Statute.   Plaintiff's Motion conspicuously makes

---

[1]   Codified in California Civil Code section 47(b).
[2]   "SLAPP" is an acronym for strategic lawsuit against public participation.
[3]   Nervous Tattoo's Counterclaims specifically state that the subpoenas at issue were served by Hardy Life, not Mr. Hardy.  Indeed, Mr. Hardy was not a party to this action at the time those subpoenas were served.  As such, to the extent that Mr. Hardy has any conceivable standing to bring the instant Motion, that standing is based solely on his alleged derogatory statements to third parties about Nervous Tattoo's goods, which statements (as detailed below) are not entitled to the protection of the Anti-SLAPP Statute.
[4]   Those Counterclaims are for intentional interference with actual and prospective economic advantage, California unfair competition, common law unfair competition and injunctive relief.

1

1  no mention of these alleged improper activities.

2      Disturbingly, and even more puzzling, is the fact that, in clear violation of

3  Local Rule 7-3[5] and this Court's Standing Order, Plaintiff and Mr. Hardy filed a

4  special motion to *strike* (i.e. an Anti-SLAPP Motion) after meeting and conferring

5  on a motion to *dismiss*. Indeed, on September 12, 2008, Plaintiff's counsel

6  specifically requested "a meet and confer next week concerning [sic] Plaintiffs'

7  contemplated motion to strike Defendants' affirmative defenses and dismiss NT's

8  counterclaims…" On September 16, 2008, counsel for all parties convened

9  telephonically to discuss Plaintiff's proposed motion to strike all of Nervous

10  Tattoo's (and all other defendants') affirmative defenses and its proposed motion to

11  *dismiss* Nervous Tattoo's fourth, fifth, sixth, seventh, eighth and ninth

12  Counterclaims because, according to Plaintiff, those Counterclaims were not

13  properly pled. The Anti-SLAPP Motion Plaintiff subsequently filed, however, is an

14  entirely different vehicle than the proposed motion upon which the parties met and

15  conferred, and is based on the "Factual Background" language in Paragraph 20 of

16  Nervous Tattoo's Counterclaims, which language has no bearing on whether the

17  Counterclaims at issue were properly pled. Notably, on September 19, 2008, three

18  days after the telephonic meet and confer, Defendants' counsel sent an email to

19  Plaintiff's counsel, "[f]ollowing up on this week's meet and confer regarding

20  Plaintiff's contemplated motions to strike Defendants' affirmative defenses and

21  *dismiss* several of Nervous Tattoo's counterclaims." Regardless of Plaintiff's

22  characterization in Reply, it is indisputable that Plaintiff will be unable to produce

23  any writing to defense counsel prior to or after the meet and confer which notified

24  of, requested a meet and confer as to, or thoroughly discussed a contemplated Anti-

25  SLAPP Motion until after the subject Motion was filed.

26      Plaintiff's Motion should be denied for several reasons. First, Plaintiff did

27  ---

[5] Local Rule 7-3 requires that "counsel contemplating the filing of any motion shall first
28  contact opposing counsel to discuss thoroughly, *preferably in person*, the substance of the
contemplated motion and any potential resolution." [Emphasis in original.]

2

1   not meet and confer (let alone "thoroughly") with Nervous Tattoo on a proposed

2   special motion to strike prior to filing the instant Motion, nor did Plaintiff comply

3   with the express prerequisites of this Court's Standing Order.   Second, Nervous

4   Tattoo has amended the Counterclaims at issue such that they no longer incorporate

5   the allegations upon which Plaintiff's Motion is based, an opportunity of which

6   Nervous Tattoo was deprived by Plaintiff's lack of a meet and confer.   Third,

7   Plaintiff cannot make a *prima facie* showing that the Counterclaims at issue arise

8   from any act taken by Plaintiff in furtherance of Plaintiff's rights of petition or free

9   speech.   To the contrary, the only "acts" specifically identified in Plaintiff's Motion

10   are the filing of the Complaint and the service of the subpoenas, neither of which

11   gave rise to Nervous Tattoo's Counterclaims.   Fourth, Nervous Tattoo's probability

12   of success on the Counterclaims at issue rises above the level required to defeat

13   Plaintiff's Motion.

14   **II.   PLAINTIFF'S   MOTION   SHOULD   BE   DENIED   BECAUSE**

15   **PLAINTIFF DID NOT SATISFY THE REQUIREMENTS OF LOCAL**

16   **RULE 7-3 AND THIS COURT'S STANDING ORDER**

17   Central District Local Rule 7-3 requires that "counsel contemplating the

18   filing of any motion shall first contact opposing counsel to discuss ***thoroughly*** . . .

19   the substance of the contemplated motion and any potential resolution." [Emphasis

20   added.]  This Court's Standing Order states, "Many motions to dismiss or to strike

21   could be avoided if the parties confer in good faith (as they are required to do under

22   L.R. 7-3) especially for perceived defects in a complaint, answer or counterclaim

23   which could be corrected by amendment." (Standing Order, p. 3.)

24   The Court's Standing Order also requires that where motions "challenging

25   pleadings are filed after the Rule 16 Scheduling Conference, the moving party shall

26   attach a copy of the challenged pleading to the Memorandum of Points and

27   Authorities in support of the motion.   *Id.*   Finally, the Court's Standing Order

28   warns, "Filings that do not conform to the Local Rules and this Order will not be

3

DOCS LA-35119v04

1  considered." *Id.*

2   As discussed below, Plaintiff did not meet and confer "thoroughly" and in

3  "good faith" (or at all) on a special motion to strike before filing its Anti-SLAPP

4  Motion.  Moreover, despite the fact that Plaintiff's Motion was filed more than two

5  weeks after the Rule 16 Scheduling Conference, Plaintiff did not attach a copy of

6  Nervous Tattoo's Counterclaims to its Memorandum of Points and Authorities.

7  Either deficiency provides a sufficient basis to deny Plaintiff's Anti-SLAPP

8  Motion.

9   On September 12, 2008, Plaintiff's counsel sent an email to Nervous Tattoo's

10  counsel that read as follows:  "Pursuant to the options you proposed for a meet and

11  confer next week concerning Plaintiff's contemplated ***motion to strike*** Defendants'

12  affirmative defenses and ***dismiss*** NT's counterclaims, we are available on Tuesday

13  Sept. 16 at 6:30 EST."  [Emphasis added.]  (Declaration of John L. Tuell ("Tuell

14  Decl."), ¶ 3, Ex. A.)

15   On September 16, 2008, counsel for all parties[6] met and conferred

16  telephonically regarding Plaintiff's proposed ***motion to dismiss*** Nervous Tattoo's

17  4th, 5th, 6th, 7th, 8th and 9th Counterclaims.  (Tuell Decl., ¶ 4.).  During that

18  teleconference, Plaintiff's counsel asserted that the referenced Counterclaims

19  should be ***dismissed*** because they were not properly pled and because some of

20  Nervous Tattoo's factual allegations alluded to conduct that (according to Plaintiff)

21  was protected by the litigation privilege.  *Id.*  At no time during the meet and

22  confer, however, did Plaintiff's counsel specify what conduct was purportedly

23  privileged (or why), nor did Plaintiff's counsel make any mention of Plaintiff's

24  intention to file a special motion to strike pursuant to the Anti-SLAPP Statute.  *Id.*

25   Following the parties' meet and confer, and in light of Plaintiff's contention

26  that Nervous Tattoo's 4th, 5th, 6th, 7th, 8th and 9th Counterclaims were not

27

28  [6] At that time, McDermott Will & Emery LLP was also counsel of record for Stephen Hoel.

4

1    properly pled, counsel for Nervous Tattoo reviewed those Counterclaims to

2    determine if Plaintiff's argument had merit. Subsequently, on September 19, 2008,

3    Nervous Tattoo's counsel wrote the following email to Plaintiff's counsel:

4         "Following up on this week's meet and confer regarding Plaintiff's

5         contemplated motions to strike Defendants' Affirmative Defenses and

6         *dismiss* several of Nervous Tattoo's Counterclaims, Defendants' []

7         position is as follows:  Defendants are willing to withdraw their Forty-

8         Second Affirmative Defense (No Substantial Similarity).     The

9         remaining Affirmative Defenses are properly articulated and will not

10        be withdrawn.  Nervous Tattoo will dismiss its Counterclaim for Trade

11        Libel without prejudice.   The remaining Counterclaims will not be

12        dismissed.  We invite you to provide and will thoroughly consider any

13        specific 9th Circuit support for your contentions that the remaining

14        Affirmative Defenses and Counterclaims are improper and/or not

15        properly pled." (Tuell Decl., ¶ 5, Ex. B.) [Emphasis added.]

16   Plaintiff's counsel never responded to the above email, never provided the

17   requested "support" for Plaintiff's contentions, never took issue with Defendants'

18   characterization of the parties' meet and confer teleconference, and certainly never

19   informed Defendants' counsel that Plaintiff really planned to file an Anti-SLAPP

20   motion instead of the motion to dismiss that was discussed during the parties' meet

21   and confer.  (Tuell Decl., ¶ 6.)  Plaintiff's bait and switch tactics are particularly

22   disturbing because, as discussed herein, Nervous Tattoo's Counterclaims are not

23   based upon Plaintiff's subpoenas or privileged communications with third parties.

24   If Plaintiff had met and conferred as required and informed Nervous Tattoo's

25   counsel that Plaintiff was contemplating an Anti-SLAPP motion based on the

26   factual allegations contained in Paragraph 20 of Nervous Tattoo's Counterclaims,

27   Nervous Tattoo would have had the opportunity to cure the perceived problems.

28   For instance, Nervous Tattoo certainly would have considered deleting that

5

1    Paragraph and, at the very least, would have agreed to amend its Counterclaims to

2    remove any objectionable language.   In fact, after reviewing Plaintiff's Anti-

3    SLAPP Motion, Nervous Tattoo's counsel wrote to Plaintiff's counsel protesting

4    that Plaintiff never met and conferred on an Anti-SLAPP motion. (Tuell Decl., ¶ 7,

5    Ex. C.)   Notwithstanding that deficiency, in the spirit of good faith, Defendants'

6    counsel offered to stipulate to removing Paragraph 20 from Nervous Tattoo's

7    Counterclaims if Plaintiff would agree to withdraw its Motion.   *Id.*   Plaintiff's

8    counsel refused to so stipulate and took the position that merely bringing the

9    California litigation privilege to Defendants' attention during a meet and confer on

10   a motion to *dismiss* constituted a proper meet and confer on a special motion to

11   *strike* pursuant to the Anti-SLAPP Statute.   *Id.*, Ex. D.

12          Notably, Plaintiff did not in its moving and supporting papers, nor can it,

13   point to a single email or writing wherein Plaintiff's counsel mentions its *intention*

14   to file an anti-SLAPP motion, much less provide any writing or declaration

15   evidencing that Plaintiff "thoroughly" met and conferred on such a motion.   The

16   declaration submitted in conjunction with the Anti-SLAPP Motion states, at

17   paragraph 3, "On September 16, 2008, I [Elliot Silverman] participated in a

18   telephone conference with the attorneys for … Nervous Tattoo … .   During that

19   conference, counsel attempted to resolve the matters raised in the accompanying

20   motion to strike."   In paragraph 4, Mr. Silverman avers, "The conference was

21   unable to resolve the parties' disagreement as to Nervous Tattoo's other

22   counterclaims, necessitating the filing of the accompanying Motion."   Despite

23   Plaintiff's burden to establish, at the outset, that the prerequisite meet and confer

24   was thoroughly conducted, Plaintiff's moving papers do not, because they cannot,

25   satisfy Local Rule 7-3 with respect to the Anti-SLAPP Motion.   Thus, Plaintiff has

26   thrown the legal equivalent of a change-up by going forward with an Anti-SLAPP

27   Motion, complete with a request for attorneys' fees and costs, after meeting and

28   conferring with respect to a motion to dismiss challenging the sufficiency of

6

Nervous Tattoo's allegations.  This is precisely the situation that Local Rule 7-3 was enacted to prevent.  Plaintiff's Motion should be denied.

## III. PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE NERVOUS TATTOO HAS AMENDED THE COUNTERCLAIMS AT ISSUE TO OMIT ANY REFERENCE TO ANY ALLEGEDLY PROTECTED ACTIVITY

As stated in this Court's Standing Order, "a party has the right to amend his complaint 'once as a matter of course at any time before a responsive pleading is served.'"  (Court's Standing Order, quoting Fed. R. Civ. P. 15(a).)  Although Plaintiff has responded to Nervous Tattoo's Background allegations and 1st, 2nd, 3rd and 4th Counterclaims, Plaintiff's Answer specifically states that "Hardy Life and Mr. Hardy have moved to strike Nervous Tattoo's [6th, 7th, 8th and 9th Counterclaims], *and no answer is therefore required* . . . ."  (Answer, p. 6.)  [Emphasis added.]

In light of the foregoing, on October 24, 2008, Nervous Tattoo filed its First Amended Counterclaims so that the Counterclaims at issue no longer incorporate or otherwise restate[7] any of the language upon which Plaintiff's Motion is based.  The only reason Nervous Tattoo did not delete Paragraph 20 in its entirety is that Plaintiff responded to that "Background" paragraph in its Answer.  If the Court concludes that Paragraph 20 should be deleted to remove any conceivable basis for Plaintiff's Motion, Nervous Tattoo hereby requests leave to do so.

Although Plaintiff may argue that its Motion should be granted even though Nervous Tattoo has amended the Counterclaims at issue, the Ninth Circuit expressly has held otherwise.  In *Verizon Delaware, Inc. v. Covad Comm.* Co., 377 F.3d 1081 (9th Cir. 2004), the Court addressed a situation nearly identical to this one.  In that case, while the defendant's Anti-SLAPP motion was pending, the

---

[7] For example, Nervous Tattoo's Counterclaim for Injunctive Relief no longer recites the language in Paragraph 20 and no longer seeks to enjoin Plaintiff from communicating with Nervous Tattoo's business associates.

7

1   district court granted the plaintiff leave to amend its complaint and deferred
2   consideration of the Anti-SLAPP motion pending receipt of the amended
3   complaint. *Id.* at 1091. The court then denied the Anti-SLAPP motion because the
4   amended complaint did not run afoul of the Anti-SLAPP Statute. *Id.*

5       The Court of Appeals affirmed on the grounds that "granting a defendant's
6   anti-SLAPP motion to strike a plaintiff's initial complaint without granting the
7   plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy
8   favoring liberal amendment." *Id.* The *Verizon* Court further held, "the purpose of
9   the anti-SLAPP statute, the early dismissal of meritless claims, would still be
10  served if [sic] plaintiff's eliminated the offending claims from their original
11  complaint." *Id.*

12      In this case, Nervous Tattoo already has amended the Counterclaims at issue
13  so that the language about which Plaintiff complains is no longer incorporated
14  therein and, given leave to do so, Nervous Tattoo will omit the "factual
15  background" language in Paragraph 20 so as to remove any trace of the challenged
16  language. As a result, Plaintiff's Motion should be denied.

17  **IV.  NERVOUS TATTOO'S COUNTERCLAIMS DO NOT VIOLATE THE**
18  **CALIFORNIA ANTI-SLAPP STATUTE**

19      If the Court chooses to consider Plaintiff's Motion despite Nervous Tattoo's
20  amendment of its Counterclaims and despite Plaintiff's failure to comply with
21  Local Rule 7-3 and the Court's Standing Order, Plaintiff's Motion still should be
22  denied because, as discussed below, Nervous Tattoo's Counterclaims did not arise
23  from privileged or otherwise protected activity and because the Counterclaims at
24  issue are likely to succeed.

25  **A.    Judicial Application Of The Anti-SLAPP Statute**

26      **1.    The "Prima Facie Case" Standard**

27  California's Anti-SLAPP Statute seeks to expose and to eliminate frivolous
28

8

1    lawsuits that are filed "primarily to chill the valid exercise of the constitutional

2    rights of freedom of speech and petition for the redress of grievances." *Id.* §

3    425.16(a); *see also Navellier v. Sletten*, 29 Cal.4th 82, 89 (2004) (a claim is subject

4    to being stricken only if it "arises from protected speech or petitioning and lacks

5    even minimal merit"). First, the Court must determine if the challenged cause of

6    action is one arising from protected activity. *Navellier*, *supra*, 29 Cal.4th at 88. If

7    the answer is yes, then the burden shifts to the plaintiff to establish a "probability

8    that the plaintiff will prevail on the claim." CCP § 425.16(b)(1); *see Church of*

9    *Scientology v. Wollersheim*, 42 Cal.App.4th 628, 653 (1996). To carry this burden

10    – and notwithstanding the statute's use of the word "probability" – the plaintiff (or,

11    in this case, the counterclaimant) need only submit evidence sufficient to establish a

12    "*prima facie* case" in support of the challenged claim. *Wilcox v. Superior Court*, 27

13    Cal.App.4th 809, 823-24 (1994); *Church of Scientology*, *supra*, 42 Cal.App.4th at

14    653. That is, the plaintiff need only "make a *prima facie* showing of facts which

15    would, if proved at trial, support a judgment in plaintiff's favor." *Wilcox*, *supra*, 27

16    Cal.App.4th at 823 (capitalization omitted). As such, "[t]he burden on the plaintiff

17    is similar to the standard used in determining motions for nonsuit, directed verdict,

18    or summary judgment." *Kyle v. Carmon*, 71 Cal.App.4th 901, 907-08 (1999); *see*

19    *also Wilcox*, *supra*, 27 Cal.App.4th at 823-24; *Church of Scientology*, *supra*, 42

20    Cal.App.4th at 653.

21        As the California Court of Appeal recently noted,

22        "the plaintiff's burden of establishing a probability of prevailing is not

23        high: We do not weigh credibility, nor do we evaluate the weight of

24        the evidence. Instead, we accept as true all evidence favorable to the

25        plaintiff and assess the defendant's evidence only to determine if it

26        defeats the plaintiff's submission as a matter of law. [Citation

27        omitted.] Only a cause of action that lacks 'even minimal merit'

28        constitutes a SLAPP." *Overstock.Com, Inc. v. Gradient Analytics,*

9

*Inc.*, 151 Cal.App.4th 688, 700 (2007) (quoting *Navellier v. Sletten*, 29 Cal.4th at 89).

### 2.    The Timing Of The Claims Is Not Determinative

The fact that a lawsuit is filed after the defendant's alleged protected activity occurred does not establish that it "arose from" protected activity for purposes of the Anti-SLAPP Statute.  *City of Cotati v. Cashman,* 29 Cal.4th 69, 77 (2002); *Navellier*, *supra*, 29 Cal.4th. at 88.  Nor is it enough to show that the plaintiff's litigation was "triggered by" or filed in response to, or in retaliation for, a party's exercise of free speech rights.  Courts will not read the Anti-SLAPP Statute to mean that "any claim asserted in an action which arguably was filed in retaliation for the exercise of speech or petition rights falls under section 425.16, whether or not the claim is *based on* conduct in exercise of those rights."  *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1002 [emphasis in original].  In order to fall within the ambit of the Anti-SLAPP statute, the plaintiff's lawsuit must, in fact, be based on defendant's protected activity.  *Id.*

### 3.    A Claim Will Survive If It Is Supported By Any Theory Of Relief

A special motion to strike will be denied if the pled facts and evidence support *any* theory for relief.  *Wilbanks v. Wolk*, 121 Cal.App.4th 883, 901 (2004).  Significantly, the plaintiff need not produce evidence that it can recover on *every* possible point urged in a specific cause of action.  If the plaintiff demonstrates that a claim is viable based on any theory alleged therein, then the court must deny the special motion to strike and allow the claim to proceed.  *Id.* at 906.

Moreover, where a single cause of action is based on both protected and unprotected activity, the claim will survive *in toto* if the plaintiff establishes a *prima facie* case (or "probability of prevailing") with respect to any part of the claim.  To this end, the California Court of Appeal expressly has held:

"Where a cause of action refers to both protected and unprotected activity and a plaintiff can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless and will not be subject to the anti-SLAPP procedure.

"Stated differently, the anti-SLAPP procedure may not be used like a motion to strike under *section 436*, eliminating those parts of a cause of action that a plaintiff cannot substantiate.  Rather, once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.  Thus, a court need not engage in the time-consuming task of determining whether the plaintiff can substantiate all theories presented within a single cause of action so as to leave only those portions it has determined have merit."

*Mann v. Quality Old Time Service, Inc.*, 120 Cal.App.4th 90, 106 (2004) (emphasis in original).  Put another way, the Anti-SLAPP Statute is intended to challenge an entire cause of action; it cannot be used piecemeal to challenge individual allegations or theories supporting the cause of action.  *See id.*

## B.     The Counterclaims At Issue Did Not Arise From Any Protective Activity

Plaintiff's entire Motion is predicated upon Paragraph 20 of Nervous Tattoo's Counterclaims, wherein Nervous Tattoo noted by way of "Background" that Plaintiff had bombarded Nervous Tattoo's sublicensees with onerous document subpoenas and alleged (on information and belief) that Plaintiff has published statements to third parties to the effect that some or all of Nervous Tattoo's goods

/ / /

/ / /

11

are unauthorized and/or counterfeit.[8]   Plaintiff argues that the Counterclaims at issue arise solely from those activities and summarily concludes: (1) that those activities are privileged and (2) that, as a result, the Counterclaims at issue should be stricken.  Plaintiff is wrong on both counts.

First, Plaintiff incorrectly assumes that the Counterclaims at issue arose from Plaintiff's service of numerous third party subpoenas and related contact with Nervous Tattoo's sublicensees.  They did not.  Rather, those Counterclaims arose from (1) Plaintiff's wrongful (and non-privileged) purported termination of the parties' License Agreement, which was meant to (and did) disrupt and otherwise interfere with Nervous Tattoo's business relationships in violation of California Business & Professions Code sections 17200, *et seq*., and (2) Plaintiff's non-privileged statements to third parties unrelated to this litigation.

Second, Plaintiff argues that the Anti-SLAPP Statute applies to all manner of speech so long as that speech has some tangential connection to litigation.  It does not.  In fact, as discussed below, the California Legislature enacted a statutory limitation on the Anti-SLAPP Statute specifically to curb its "disturbing abuse" and address the type of non-privileged speech at issue in Nervous Tattoo's Counterclaims, because the abuse of the Anti-SLAPP Statute became prevalent not long after enactment of the Anti-SLAPP Statute.

### 1.   **Plaintiff's Wrongful Termination Of The License Agreement Is Neither Privileged Nor Protected**

Paragraph 21 of Nervous Tattoo's Counterclaims (which Plaintiff's Motion completely ignores) sets forth the chain of events leading up to Plaintiff's purported

---

[8] Notably, Plaintiff does not deny that it has made derogatory statements to third parties about Nervous Tattoo's goods.  Rather, Plaintiff carefully contends, "Even if Hardy Life did make the alleged statements, such statements would be protected by the litigation privilege . . . ."  (Motion, p. 10.)  Of course, if Hardy Life never made any such statements, it would be impossible for Nervous Tattoo's Counterclaims to "arise" from them and Plaintiff's Motion necessarily would fail.

12

1   termination of the License Agreement and alleges that Plaintiff's purported

2   termination was neither "effective [nor] proper" and was, in fact, an attempt to

3   "circumvent the judicial process." Those allegations were incorporated by

4   reference into Nervous Tattoo's 6th, 7th, 8th and 9th Counterclaims because those

5   Counterclaims specifically "arose" from Plaintiff's wrongful purported termination

6   of the License Agreement.

7       Terminating an agreement is not a protected activity under the Anti-SLAPP

8   Statute. In *Marlin v. Aimco Venezia*, LLC, 154 Cal.App.4th 154 (2007), the

9   California Court of Appeal (2nd App. Dist.) addressed an analogous situation. In

10  *Marlin*, landlords filed a notice with the City of Los Angeles (pursuant to a

11  California statute and a city ordinance) that they intended to remove a number of

12  apartments (including the Marlins' apartment) from the rental market and also

13  served the Marlins with a notice to vacate. The Marlins filed a complaint seeking a

14  judicial declaration of their rights under the California statute. The landlords

15  responded with an Anti-SLAPP motion, claiming that the Marlins' complaint arose

16  from the notices filed with the City of Los Angeles and from other litigation

17  regarding the building in question. *Id.* at 157.

18      The *Marlin* Court first noted, "the mere fact that an action was filed after

19  protected activity took place does not mean the action arose from that activity for

20  purposes of the anti-SLAPP statute." *Id.* at 160. Ultimately, the Court concluded,

21  "Clearly, the cause of Plaintiff's complaint was defendants' alleged wrongful

22  reliance on the [statute] as their authority for terminating plaintiff's tenancy.

23  Terminating a tenancy or removing a property from the rental market are not

24  activities taken in furtherance of the constitutional rights of petition or free speech."

25  *Id.* at 161.

26      Here, as in *Marlin*, Plaintiff opened two fronts in the self-serving war it has

27  waged against Nervous Tattoo. On one front, Plaintiff filed its Complaint and

28  served its subpoenas. Although Plaintiff's motivation is believed to be unrighteous,

1   Nervous Tattoo does not dispute that those acts are protected conduct.   On the
2   second front, however, Plaintiff took the drastic, unjustified and non-privileged step
3   of terminating the License Agreement which, as in *Marlin*, was absolutely not
4   "taken in furtherance of the constitutional rights of petition or free speech."
5   Because Nervous Tattoo's Counterclaims "arose" from Plaintiff's actions on the
6   second front and not the first, Plaintiff's Motion should be denied.

**2.   Plaintiff's Statements To Third Parties Are Not Protected**

8       After a cursory and inaccurate analysis of the first prong of the Anti-SLAPP
9   Statute, Plaintiff concludes that "any statements made by Hardy Life about whether
10  Nervous Tattoo's goods are authorized would also relate to this litigation.   Hardy
11  Life has thus made a *prima facie* showing that the anti-SLAPP statute applies to
12  Nervous Tattoo's counterclaims." (Motion, p. 5.)   Not logically sound, not what its
13  cited authority holds, and not true.   In point of fact, Hardy Life has made no
14  showing at all because its Motion fails specifically to identify ***a single privileged***
15  ***statement*** that could have given rise to Nervous Tattoo's Counterclaims.   *See Brill*
16  *Media Co., LLC v. TCW Group, Inc.*, 132 Cal.App.4th 324, 329 (2005) (Moving
17  party has initial burden of setting forth the facts "upon which the liability or defense
18  is based.").   Instead, Plaintiff argues that "even if" it made derogatory statements
19  about Nervous Tattoo, any such statements would be protected.   (Motion, p. 10.)
20  Plaintiff's hypothetical argument hardly satisfies the first prong of the Anti-SLAPP
21  Statute.

22      Perhaps Plaintiff's failure to identify any specific statements can be explained
23  by Plaintiff's knowledge and concern that CCP section 425.17 expressly excludes
24  commercial speech from the protections of the Anti-SLAPP Statute.   That Section
25  poignantly prefaces as follows:

26          "The Legislature finds and declares that there has been a
27      disturbing abuse of Section 425.16, the California Anti-SLAPP Law,
28      which has undermined the exercise of the constitution rights of

14

freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16." *Id.*, § 425.17(a).

To curb this "disturbing abuse," CCP section 425.17 provides as follows:

> **"Section 425.16 does not apply** to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . . arising from any statement or conduct by that person if both of the following conditions exist:   **(1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods or services that is made for the purpose of . . . commercial transactions in [] the person's goods or services.   (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer."** [Emphasis added.]

Plaintiff's statements about Nervous Tattoo's goods (and Plaintiff's Motion) are precisely the kind of "disturbing abuse" that CCP section 425.17 was enacted to prevent.  First, Plaintiff does not deny that it is "primarily engaged in the business of selling . . . goods or services."   To the contrary, Plaintiff's First Amended Complaint ("FAC") specifically states that "Mr. Hardy and his business Partner formed Hardy Life to license Mr. Hardy's trademarks, copyrights and artwork to third parties." (FAC, ¶ 10.)

Second, Plaintiff cannot escape the fact that its statements to third parties about Nervous Tattoo's goods are "representations of fact about . . . a business competitor's business operations, goods or services . . . made for the purpose of . . . transactions in Plaintiff's goods or services."   Indeed, Plaintiff argued in its Motion for Preliminary Injunction that "the parties both use retail stores and the internet to

/ / /

/ / /

15

advertise their products"[9] and has openly acknowledged its intention to re-license its artwork and trademarks to someone else if it succeeds in wresting away Nervous Tattoo's contractual rights.  In sum, there can be no doubt that Plaintiff has positioned itself as Nervous Tattoo's "business competitor," nor that Plaintiff's statements to third parties about Nervous Tattoo's goods were made in the context of Plaintiff attempting to sell its own goods and services.

Similarly, there can be no doubt as to whether "the intended audience" of Plaintiff's statements "is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ."  Plaintiff is in the business of licensing Mr. Hardy's artwork and trademarks to third parties such as Nervous Tattoo and Nervous Tattoo's sublicensees.  It stands to reason that, if Plaintiff succeeds in stripping Nervous Tattoo of its license, the first people to whom Plaintiff will try to re-license its goods (if it has not done so already) will be the companies which already manufacture those goods.  Indeed, the most efficient plan of action for Plaintiff would be to simply slip into Nervous Tattoo's shoes (or sell the license to someone else that could) and take advantage of the extensive network of sublicensees, manufacturers and distributors that Nervous Tattoo developed and, therefore, already has in place.

In summary, Plaintiff's derogatory statements to third parties about Nervous Tattoo's goods are not protected by the Anti-SLAPP Statute regardless of whether they were made to Nervous Tattoo's sublicensees or to other third parties with whom Plaintiff hopes to do business.  Either way, those statements fall squarely within the exception articulated in CCP section 425.17.  Plaintiff's Motion presents the paradigm of "disturbing abuse" that statute was enacted to prevent.

---

[9] Although Plaintiff may point out that Nervous Tattoo argued against the concept of Plaintiff being Nervous Tattoo's business competitor in its Opposition to Plaintiff's Motion for Preliminary Injunction, that Opposition was filed nearly a month before Plaintiff purported to terminate the License Agreement and position itself as a direct competitor for Nervous Tattoo's customers, sublicensees and other business relationships.

16

### C.    Nervous Tattoo Is Likely To Succeed On Its Counterclaims

Even if Plaintiff satisfies the first prong of the Anti-SLAPP Statute (which Nervous Tattoo respectfully submits Plaintiff has not satisfied), Plaintiff's Motion must be denied if Nervous Tattoo demonstrates that its Counterclaims are viable on *any theory*. *Wilbanks, supra*, 121 Cal.App.4th at 906. Notably, Plaintiff's argument that Nervous Tattoo will not prevail on its Counterclaims is based entirely on the erroneous assertion that Nervous Tattoo's Counterclaims arose from Plaintiff's subpoenas and statements to third parties (as those activities are absolutely privileged). As detailed above, the Counterclaims at issue arose not from Plaintiff's subpoenas or protected communications, but rather from Plaintiff's commercial speech and wrongful purported termination of the License Agreement, neither of which is privileged or otherwise entitled to the protection of the Anti-SLAPP Statute.

Additionally, and importantly, if the Court were to find that Nervous Tattoo's Counterclaims are based on both protected and unprotected activity, those Counterclaims will survive *in toto*. As such, even if the Court concludes, for example, that Plaintiff's derogatory statements to third parties about Nervous Tattoo's goods are somehow privileged or otherwise protected, Plaintiff's Motion still must be denied because Plaintiff's wrongful termination of the License Agreement certainly was not.

### 1.    Nervous Tattoo Is Likely To Prevail On Its Counterclaim For Intentional Interference With Actual And Prospective Economic Advantage

The elements of a claim for relief for Intentional Interference are (1) an economic relationship between Nervous Tattoo and a third party from which Nervous Tattoo gains current economic benefit or which has the probability of future economic benefit; (2) Plaintiff's knowledge of that relationship; (3)

17

intentional and wrongful conduct on the part of Plaintiff designed to interfere with or disrupt that relationship; (4) actual disruption or interference; and (5) resulting economic harm to Nervous Tattoo.   *See Overstock.Com, Inc., supra*, 151 Cal.App.4th 713.  All five elements are satisfied here.

Nervous Tattoo has existing and lucrative contractual relationships with numerous sublicensees, manufacturers, distributors and financial institutions, and prospectively lucrative relationships with countless others.  Plaintiff is keenly aware of these relationships, as evidenced by Plaintiff's issuance and service , at the outset of this action, of (admittedly privileged) subpoenas on dozens of Nervous Tattoo's sublicensees, whose identities are listed on the "donedhardy.com" website.  There also can be no doubt that Plaintiff's derogatory, non-privileged statements to third parties about Nervous Tattoo's goods and purported termination of the License Agreement were wrongful, nor that those actions were designed to interfere with Nervous Tattoo's business relationships.  In fact, Plaintiff has made no effort to hide the fact that its ultimate goal is to destroy Nervous Tattoo's business and that its actions, if successful, will have that effect.

And Plaintiff's wrongful actions certainly have disrupted and interfered with Nervous Tattoo's business relationships.   Nervous Tattoo's President, Henry Mandell, has been forced to spend an inordinate amount of time communicating with Nervous Tattoo's sublicensees, manufacturers, distributors and other business associates in an attempt to assuage their concern that Plaintiff's wrongful purported termination of the License Agreement will cripple Nervous Tattoo and subject them to legal liability for doing nothing more than fulfilling their contractual obligations. (Declaration of Henry R. Mandell, ¶ 2.)  Worse, Mr. Mandell recently learned that, due to Plaintiff's purported termination of the License Agreement, one of Nervous Tattoo's primary lenders will no longer provide financing on Nervous Tattoo's

/ / /

/ / /

18

inventory, which could prove devastating to Nervous Tattoo's day-to-day operations.[10] *Id.*

### 2.   Nervous Tattoo Is Likely To Prevail On Its Counterclaims For Statutory And Common Law Unfair Competition.

To prevail on its unfair competition claim under Cal. Bus. & Prof. Code sections 17200, *et seq.* ("B&P 17200"), Nervous Tattoo need only establish that Plaintiff engaged in "any unlawful, unfair or fraudulent business act or practice." *Pepsico, Inc. v. Cal. Security Cans*, 238 F.Supp.2nd 1172, 1176 (C.D. Cal. 2002). The "sweeping language" of B&P 17200 is intended "to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur." *Overstock.Com, supra*, 151 Cal.App.4th at 714.

There is no question that Plaintiff's derogatory statements to third parties about Nervous Tattoo's goods and wrongful purported termination of the License Agreement constitute unfair business practices and common law unfair competition. Those acts were (and are) specifically intended to destroy Nervous Tattoo's business and afford Plaintiff an unfair competitive advantage in its quest to either step into Nervous Tattoo's shoes or re-license Nervous Tattoo's exclusive rights to the highest bidder.

### 3.   Nervous Tattoo Is Likely To Prevail On Its Counterclaim For Injunctive Relief

As was discussed before the Court during the Rule 16 Scheduling Conference on September 29, 2008, Nervous Tattoo's intention has never been to enjoin Plaintiff from contacting Nervous Tattoo's sublicensees in the context of legitimate discovery relating to this litigation. Rather, Nervous Tattoo's claim for

---

[10] Nervous Tattoo has not yet had the opportunity to take the depositions of Mr. Hardy and Mr. Hoel or the numerous third parties to which those gentlemen are believed to have made derogatory statements about Nervous Tattoo's goods. Notably, though, Plaintiff's Motion does not deny (and appears to concede) that such statements have been made. As such, to the extent that Nervous Tattoo currently lacks testimonial evidence as to the nature of those statements, that shortcoming likely will be resolved in the near future.

19

DOCS*LA-35119v04

1  injunctive relief arose from Plaintiff's derogatory, non-privileged statements to
2  third parties about Nervous Tattoo's goods and seeks to enjoin Plaintiff from
3  further damaging Nervous Tattoo's business and goodwill through such
4  unprotected commercial speech or from otherwise attempting to interfere with
5  Nervous Tattoo's business relationships.   Nervous Tattoo's Counterclaim for
6  injunctive relief also seeks to enjoin Plaintiff from acting upon its wrongful
7  purported termination of the License Agreement which, as detailed above, is not
8  remotely privileged.

9       In sum, none of Nervous Tattoo's Counterclaims arose from (or seek to
10 enjoin) any privileged or protected activity, and all of Nervous Tattoo's
11 Counterclaims are likely to succeed.  Plaintiff's Motion, if it is to be considered at
12 all, should be denied in its entirety.

**V.    CONCLUSION**

14      For all the reasons set forth above, Plaintiff's Motion should be denied in its
15 entirety.

17 DATED:  October 27, 2008          DICKSTEIN SHAPIRO LLP

19                                   By
20                                      James H. Turken
                                        Amy L. Rubinfeld
                                        John L. Tuell
21                                      Fawn A Wright
                                   Attorneys for Defendant and Counterclaimant
22                                 NERVOUS TATTOO, INC.; and Defendants
                                   CHRISTIAN AUDIGIER, INC; BACKSTAGE
23                                 WEB, INC; and SHOP ON STAGE, INC.

20