# EXHIBIT 3

## RESTATED AND AMENDED LICENSE AGREEMENT

LICENSE AGREEMENT, effective as of July 1, 2005, by and between HARDY LIFE, LLC, a California Limited Liability Company [hereinafter "Licensor"], and NERVOUS TATTOO, INC., a California corporation [hereinafter "Licensee"], as follows:

1.      Licensor is the creator of certain artwork designed by Licensor for the art of tattooing [the "Artwork"] and is the owner of intellectual property rights in and to the names "Don Ed Hardy" and "Ed Hardy" and the right of publicity in and to those names and their images, likenesses, voices, signatures and visual representations thereof. Licensor is the owner of the trademark "Don Ed Hardy" which trademark is understood to encompass "Ed Hardy." To the extent necessary, Licensee shall separately trademark the name "Ed Hardy" for the licensor's benefit. "Don Ed Hardy", "Ed Hardy" and  "Hardy" shall hereinafter collectively be referred to the "Trademarks."  No ownership interest in any of the Artwork, property rights or Trademarks, whether now or hereafter existing, is being transferred herein and, other than that set forth in this Agreement, all rights to, interest in and goodwill relating to the Artwork, property rights and Trademarks belong exclusively to Licensor.

2.      Subject to the limitations set forth herein, Licensor hereby grants to Licensee an exclusive license to, at its discretion, design, manufacture, promote, advertise, sell, at wholesale, retail or through the internet (including the right to operate In-Store shops), and distribute (sometimes through third parties) throughout the world products bearing such artwork and/or trademark(s) of Licensor [hereinafter "Licensed Products"] with the express exception of those products set forth below in this paragraph which are excluded from the scope of this Agreement and from the license being granted herein:

> posters, lithographs, printed art, reproductions, calendars, books, greeting cards, printed paper (coated or uncoated), cardboard, ceramics and weapons; Except that, certain promotional use of the trademarks shall be permitted on shopping bags, napkins, ceramics as used in the operation of a café, cardboard packaging of authorized products, and any ancillary use in the exploitation of an excepted product hereunder.

3.      Licensee within One Hundred and Eighty (180) days of the effective date of this agreement, will acknowledge receipt of the Artwork from Licensor who shall deliver the Artwork to Licensee in catalogued form through the use of scanned images and general descriptions of each scan. Such release of scanned images shall serve as a quality control review and as a grant of permission to use the specific catalogued Artwork in all product categories permitted by this Agreement; unless, certain scanned images are specifically excluded from use in specific product categories in writing.

a.      It is the intent of Licensor to provide additional seasonal artwork to Licensee during the term of this Agreement, using the same quality control protocol as above, provided, however, that Licensor  shall be under no obligation to do so. Should Licensor fail to provide additional seasonal artwork, Licensee shall have the right to serve ninety (90) days written notice upon Licensor to provide additional artwork or Licensee may terminate the Agreement.

b.    Licensee, from time to time, may also exploit, under the terms of this agreement, artwork submitted by other tattoo artists ["Community Artwork"]. Licensor has the right to approve or disapprove such Community Artist or Community Art which approval or disapproval shall be provided by Licensor to Licensee within thirty (30) days of the submission of the identity of the proposed Community Artist or Community Artwork by Licensee. Any such Community Artwork or Community Artist shall be identified by reference first to the name of the Licensor and then the name of the Licensee. (ie, "Ed Hardy, Community Artist Collection.") Further, Licensor has the right to withdraw any prior approval granted to Licensee for good faith business reasons by providing written notice that Licensee cease the exploitation of such Community Artist or Community Artwork within ninety (90) days of delivery of such written notice to Licensee.

4.    Upon reasonable request, Licensee shall permit Licensor or its duly authorized representative the right to inspect the labels and tags on the goods offered pursuant to this Agreement.

5.    When requested, Licensee agrees to send samples of advertising and promotional materials, as well as goods and promotional and advertising materials bearing or sold under the Trademarks, and any other documents that may permit Licensor to determine whether the goods and services and trademark uses of the Trademarks meet the standards, specifications, and directions approved by Licensor.

6.    All licensed products containing Community Artwork shall be approved on a season to season basis, in advance and in writing, by Licensor provided that such approval shall be provided within Fourteen (14) days of submission, which approval shall not be unreasonably withheld. The failure of Licensor to either approve or disapprove any particular product sample for the Community Artwork within fourteen (14) days of its receipt shall be deemed to be an express approval. However, Licensor shall have no approval rights over any licensed products, which commercializes the Artwork. Upon acceptance by Licensor of the use of Community Artwork in a particular class of use, the further consent or approval of Licensor is not necessary in connection with the exploitation of that particular use.

7.    The cost of developing and producing designs, including graphics designs, for licensed products shall be borne by Licensee and Licensee shall hold Licensor harmless therefrom.

8.    Licensee shall have the right to determine its own product planning and sales and advertising policies.

9.    Any artwork, advertising and promotional materials involving a trademark of Licensor, but not designed by Licensor, shall be approved, in advance and in writing, by Licensor provided that such approval shall be provided within fourteen (14) days of submission and shall not be unreasonably withheld. The failure of Licensor to either approve or disapprove any such proposed artwork, advertising and/or promotional materials within ten days of receipt shall be deemed to be an express approval.

2

10.     Licensor shall retain the right to develop, sell and distribute experimental art clothing, provided, however, that Licensee shall have the right of first refusal to make and sell and distribute such clothing. Licensee may exercise this right of first refusal by giving written notice to Licensor within 30 days after receipt of a detailed description of any such experimental art clothing project from the Licensee in a written submission. The failure to give notice of the exercise of the right of first refusal within said 30 days shall be deemed to be a waiver of the right of first refusal by the licensee. It is also understood that clothing of a limited commercial character or use expressing the personal creativity of Don Ed Hardy himself of a non-classic tattoo design nature are exempted from this agreement.

11.     Licensee shall pay Licensor a royalty in accordance with the schedule set forth below. Payments shall be calculated in U.S. dollars using the exchange rate for the fifteenth (15th) day of the relevant month (or the next business day if any such day falls on a weekend or on a holiday) as set forth in the U.S. Edition of *the Wall Street Journal* and shall be wired to a bank account of Licensor to be provided.

a.     Royalties shall be paid from Net Wholesale Sales ("Net Sales") of licensed products as follows:

- 5% of the net sales up to $5 million of net sales
- 4% of the net sales in excess of $5 million up to $10 million
- 3-1/2% of the net sales in excess of $10 million up to $50 million
- 3% of the net sales in excess of $50 million

b.     Annual Net Sales shall be calculated on an annual royalty year beginning July 1 and ending June 30 of the subsequent year.

c.     The term "Net Sales" shall be defined as the gross wholesale sales of licensed products less i) refunds, allowances, markdowns, credits, promotional items and allowances actually made or allowed to customers for returned products, ii) customary trade discounts (including anticipations) afforded to and actually taken by customers against payment for licensed products and iii) sales, use or value added tax assessed on sales (only where applicable and specifically excluding any franchise, remittance, gross receipts or incomes taxes).

d.     "Net sales" shall also include wholesale sales of licensed products to an entity responsible for Internet sales.

e.     With respect to sales made by Licensee to a sub-licensee operating a retail store, royalties shall be paid in accordance with this paragraph (9) on the wholesale Net Sales by Licensee to the sub-licensee and not on the retail sales of the sub-licensee.

12.     With respect to royalties received by Licensee from sub-licensees, Licensee shall pay to Licensor a royalty equal to 2% of such sub-licensee's net sales amount on a cash basis. Should Licensee receive a sub-licensing fee in addition to a royalty payment, such sub-licensing fee shall belong solely to Licensee. The Net Sales attributable to the sale of any Community Art shall also bear royalty rate of 2% payable to the Licensor. In addition, the sales of any

3

Trademark Derivatives (means a newly created label that is based on or derives out of the exploitation of "Don Ed Hardy" "Hardy" or "Ed Hardy" any combination or abbreviation thereof) shall bear a royalty rate of 2% payable to the Licensor. Private label sales made as a result of Intellectual Property and any styles used by Licensee that are copied from any Hardy design are to be reported separately and at a royalty rate of 2%.

13.   All royalties, regardless of source, shall be paid on a quarterly basis as follows:

| QUARTER | PERIOD | DUE DATE |
|---------|--------|----------|
| 1st | January 1 through March 31 | April 30 |
| 2nd | April 1 through June 30 | July 31 |
| 3rd | July 1 through September 30 | October 31 |
| 4th | October 1 through December 31 | January 31 |

a.   Notwithstanding the royalty schedule set forth above, Licensee shall pay Licensor a **guaranteed minimum royalty** of $112,500 per quarter. Licensee shall pay Licensor, on a quarterly basis as set forth above, the greater of the royalties earned or the guaranteed minimum amount. The initial quarter and final quarter of this Agreement shall be paid on a pro-rata basis.

b.   In addition to the quarterly payment of royalties, Licensee shall simultaneously and, no later than 30 days following the close of each quarter, provide royalty reports and associated documentation as required by Licensor to legal counsel for Licensor.

14.   Licensee shall have the right to procure sub-licensees and to enter into sub-license Agreements for the design, manufacture, advertising, promotion, sale and/or distribution of the licensed products provided that all such licensees shall present evidence of issuance of liability insurance to Licensor, as a named co-insured, liability insurance in the amount of $5,000,0000-Aggregate and $2,000,000 per occurrence for clothing and related products and $10,000,000-aggregate and $3,000,000 per occurrence for motorcycles and related equipment or other sporting products. Sub-license Agreements may not confer any rights upon the sub-licensee, which are greater than those rights of Licensee hereunder. Upon the execution of a sub-license Agreement, Licensee shall provide Licensor with a copy of any such Agreement.

a.   It is expressly understood that Licensee shall be solely responsible for any sub-licensing program and nothing within any sub-license Agreement or sub-licensing program shall alter the rights of Licensor hereunder including the rights to approve samples of licensed products.

b.   It is expressly understood that Licensee may not have an interest, either directly or indirectly, in any sub-license Agreement, without the express written consent of Licensor. Notwithstanding, Licensor hereby agrees that Licensee may enter into a sub-license Agreement with Nervous Tattoo SARL ("SARL"), covering the territory of Europe, , or any other hereinafter formed entity controlled by the Licensor or any of its principals, provided, however, that royalties to be paid to Licensor by Licensee thereunder shall be based on combined sales of SARL and Licensee and any of its sub licensee affiliates in accordance with the royalty rates set forth in paragraph (9) hereinabove.

4

Siamas Dec., P.79

     c.    It is expressly understood that Licensee shall not have the right to sub-license, men and women's tops or headwear bearing the Don Ed Hardy or Ed Hardy trademarks without the express written consent of Licensor.

    15.    Licensee shall keep accurate and complete books of account and records with respect to all transactions relating to or arising out of this license Agreement. Such books and records shall be maintained separately from the books and records of Licensee with respect to any other business conducted by Licensee. Licensee shall permit Licensor, or its designated agent(s), to have full access to such books and records to examine and copy, at Licensor's expense, all of such books and records as they pertain to this Agreement. Such access shall be on a reasonable basis not to exceed one day per month. Licensor shall have the right to such inspection during reasonable business hours without prior notice. All of the books and records of Licensee as they pertain to this Agreement shall be retained by Licensee for a period of four years after the expiration of this Agreement or, in the event of a dispute between parties and suit is filed, two years after the entry of a final judgment. The acceptance by Licensor of any statements, reports and/or payments from Licensee shall not constitute a waiver by Licensor of the right to question the accuracy of any of the books, records or payments by Licensee. This right of inspection shall apply to books maintained by Licensee in Europe and in countries other than in the United States. Licensee shall provide Licensor with the location of all such books and records in order that Licensor may make inspections hereunder.

    16.    In the event that Licensor discovers a discrepancy in the books and records of Licensee and/or an underpayment by Licensee, and the Licensee is in agreement with such discrepancy, the cost of any such inspection or examination shall be borne by Licensee, and Licensee shall have 30 days from the receipt of written notice from Licensor to correct such books and records and to pay any monies due plus a 2% penalty on amounts due. Failure to do so shall constitute a default hereunder. In the event the Licensee does not agree with such discrepancy, the dispute shall be submitted to a retired Justice or Judge who shall arbitrate pursuant to the arbitration procedure set forth in California Code of Civil Procedure section 1280 et. seq. and render a final, binding award over such dispute. Discovery shall be limited to requests for production of documents. The prevailing party at arbitration shall be entitled to recover its costs and reasonable attorneys fees arising therefrom.

    17.    In the event an inspection or examination of the books and records of Licensee disclose an overpayment, the amount of such overpayment shall be credited against the next future payment of royalties to Licensor.

    18.    Licensee shall carry, at its sole expense, a policy of product liability insurance of not less than $2 million during the term of this license Agreement that shall remain in force and effect for a period of three years following the termination of this Agreement. Said insurance policy shall name Licensor and the trademarks of Licensor as additional insureds. Proof of said insurance shall be provided to licensor no later than September 30, 2005. Failure to do so shall give Licensor the right to declare a default hereunder.

    19.    Licensee shall comply with all laws of the states wherein they are qualified to do business where such laws materially affect the ability of the Licensee to conduct business in that 

5

particular state   In the event Licensee is not in compliance with the laws of any particular state wherein it is conducting business, it shall have ninety (90) days after written notice of such breach to cure any violation of the law after notice of such violation has been provided by the local administrative or governmental agency.

20.     Licensee shall be responsible, at its expense to secure and preserve the Hardy Trademark rights in and to the Trademarks and IP rights including without limitation in the execution submission and prosecution (which shall include the filing of lawsuits to enforce such intellectual property) of any trademarks, service marks, copyrights and patent applications and similar applications for registration which Licensee may desire to submit at any time from time to time throughout the world.  Licensee may submit any such application any where in the world to register the trademarks for the products or services or any other service mark, design right or invention, without the prior written approval of Licensor.

21.     Licensor shall, at its sole expense, defend and indemnify any action that is based upon a claim that any trademark of Licensor constitutes an infringement of any other existing trademark or other property right belonging to a third party and shall indemnify and hold Licensee harmless there from.  Licensee shall cooperate with Licensor in any such legal proceeding.  Choice of legal counsel for the defense of such action shall be with the Licensor.

22.     Licensor shall, at its sole expense, defend any action that is based upon a claim that any copyright of Licensor or of the activities of Licensee as contemplated by this Agreement constitutes an infringement of any other existing copyright or other rights of a third party and shall indemnify and hold Licensor harmless there from.  Licensee shall cooperate with Licensor in any such legal proceeding.  Choice of legal counsel for the defense of such action shall be with the Licensor.

23.     The term of this Agreement shall be ten years commencing July 1, 2005 and terminating June 30, 2015.  Provided that Licensee is not in default, Licensee shall have the right upon no less than 90 days written notice to Licensor to renew this Agreement for successive ten year terms upon the same terms and conditions.

24.     In the event of a material breach of any term or condition of this Agreement, the breaching or defaulting party shall have 30 days upon receipt of written notice to cure said default or breach.  Should the defaulting or breaching party fail to cure within said 30-day period, the injured party shall have the right to thereupon terminate this Agreement.

25.     At the termination of this Agreement and any extension period thereof or upon other termination of this Agreement, any and all rights licensed to Licensee hereunder shall immediately terminate and all such rights shall revert back to Licensor.

26.     In the event of a petition in bankruptcy of Licensee, whether voluntary or involuntary, insolvency, or an assignment of the benefits of creditors of Licensee, this Agreement shall be thereupon terminated.  Not less than forty-five (45) days prior to the expiration of this agreement or within five (5) days after the termination of licensees rights under this agreement Licensee shall furnish to Licensor a certificate listing its inventory of products on hand ("Remaining Inventory").  Licensee shall have 180 days after termination or expiration of this agreement to sell of any and all Remaining Inventory.

6

27.     This Agreement shall be construed in accordance with the laws of the State of California. In the event of any dispute between the parties hereto, the Los Angeles Superior Court shall have exclusive jurisdiction. In the event of a breach of this Agreement and suit is filed, the injured party is entitled to seek all available remedies and relief including compensatory damages, equitable relief including an injunction, punitive damages where applicable and all other appropriate pre-trial and post-trial remedies. The prevailing party shall be entitled to recover of its costs of suit and reasonable attorneys fees both at the trial level and on appeal.

28.     This Agreement may not be modified unless expressly in writing and signed by each party hereto.

29.     The waiver by either party of any term or provision of this Agreement or the waiver of any breach thereof shall not be deemed to be waiver of any other term or provision or the waiver of any breach thereof.

30.     In the event any term or provision of this Agreement is deemed unenforceable by a court of competent jurisdiction, the remaining terms and provisions shall remain in full force and effect.

31.     All notices hereunder shall be writing and shall be either personally served or served by first class mail addressed, unless subsequently indicated, as follows:

|  |  |
|---|---|
| Licensor: | Hardy Life LLC<br>700 Lombard Street<br>San Francisco, California 94133<br>Attention: Don Ed Hardy, Managing Member |
| Licensee: | Nervous Tattoo, Inc.<br>706 North Orange Grove Ave<br>Los Angeles, California 90046<br>Attention: Christian Audigier, CEO |

32.     Licensee shall not assign any of its interest in or rights to this Agreement without the express written consent of Licensor, which consent shall not be unreasonably withheld. Any such assignment without written consent shall be null and void.

33.     It is expressly understood that this Agreement does not create a partnership nor a joint venture nor any other business relationship between Licensor and Licensee other than a license Agreement.

34.     This Agreement shall supersede any prior and/or existing agreements between the parties hereto.

35.     This Agreement may be executed in counter-parts. Executed counter-parts of this agreement transmitted by facsimile shall have the same force and binding effect as that of each party's original signature.

7

Siamas Dec., P.82

36.    This Agreement contains the entire understanding of the parties with regard to the within subject matter.  No party hereto has made any representation, warranty, covenant or undertaking of any nature whatsoever, express or implied, with respect to this Agreement, other than that expressly set forth herein.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year set forth below.

DATED: _18 Sept. 2005_, 2005  HARDY LIFE, LLC
            [Licensor]

            By: _____
            Don Ed Hardy, Managing Member

DATED: _9/18/2005_, 2005  NERVOUS TATTOO, INC.
            [Licensee]

            By: _____
            Christian Audigier, CEO

8

Siamas Dec., P.83